## BALFOUR v. FIRST NAT. BANK OF THE DALLES.

### (District Court, D. Oregon. May 26, 1919.)

### No. 7037.

PRINCIPAL AND AGENT ⬥➩103(11)—AUTHORITY BY AGENT—SALE ON CREDIT.
Correspondence between the parties *held* to constitute defendant bank general agent for plaintiff in relation to a sale of land, and not merely a depositary of the deed in escrow, and defendant's action in accepting security for a deferred payment *held* within its authority as such agent, exercised in good faith.

At Law. Action by Thomas Balfour against the First National Bank of The Dalles. Judgment for defendant.

This is an action to recover against the defendant bank for failure to observe the conditions of an escrow agreement, which the plaintiff alleges he had with the bank, in relation to a sale of certain real property which plaintiff had agreed, upon compliance with the conditions imposed, to convey to one Nathan Whealdon. The complaint sets out in brief that, prior to December 29, 1910, plaintiff had bargained and agreed to sell the property to Nathan Whealdon for $35,000 cash upon delivery of a deed; that subsequently the plaintiff forwarded a deed to the property, duly executed, to defendant in escrow, with instructions that the defendant should deliver the same to Whealdon when he paid over to the bank for account of plaintiff the sum of $35,000; that subsequently plaintiff authorized defendant to deliver the deed to Whealdon upon receipt from him of $20,000 in cash, and a mortgage note and a first and paramount mortgage, executed by himself and wife, for $15,000 on the whole of the property conveyed, payable in 90 days, "to be amply and doubly secured"; but that defendant wrongfully and fraudulently omitted to observe the specific escrow instruction of plaintiff, in that the defendant delivered the deed, not to Whealdon, but to one Le Roy Park, to whom Whealdon and wife had conveyed the property, and accepted from Park the sum of $25,000 and a mortgage to secure the payment of $10,000, payable in 90 days, which said mortgage did not cover all the property conveyed by plaintiff to Whealdon. It is further shown that plaintiff foreclosed the mortgage and bid in the property covered thereby for the sum of $3,064.88. Wherefore plaintiff prays judgment for the difference between the amount bid and the mortgage note, with interest and accumulated taxes.

The answer of the bank in effect denies omission or failure to observe the instructions of plaintiff appertaining to the escrow agreement, and alleges that Mr. Malcolm A. Moody was the agent of the plaintiff, as it respects the sale of the land by plaintiff, and that what the defendant did, in delivering the deed to Whealdon and accepting the mortgage of Park covering the balance due plaintiff after the payment of the $25,000, was in obedience to the instructions of Moody acting in plaintiff's behalf, and that the transactions were carried out in good faith, without any purpose or intent to defraud plaintiff.

The cause was tried to the court, without the intervention of a jury.

Platt & Platt and Hugh Montgomery, all of Portland, Or., for plaintiff.

Martin L. Pipes, John M. Pipes, and George A. Pipes, all of Portland, Or., for defendant.

WOLVERTON, District Judge (after stating the facts as above). The matter for discussion rests mainly on correspondence between the plaintiff, Moody, and the defendant bank, and presents largely a question of interpretation of such correspondence. As a preface to

⬥➩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the opinion, it should be stated that the plaintiff and Moody had, for some time previous to the negotiations concerning the sale of the real property in question, been warm and intimate friends, and subsequent to the plaintiff's departure for England Moody had been the confidential agent of plaintiff in attending to his business here, which was, taking it altogether, of considerable moment.

Some time prior to July, 1910, one Charles Booth, of Butte, Mont., had written to plaintiff offering to take an option for the purchase of the land, which offer was accepted by plaintiff with a time limitation running until December 1, 1910. On July 25, 1910, plaintiff wrote the bank advising it of this option, and gave minute instructions for carrying it into effect. Among other things, plaintiff importuned the bank to undertake the "management" of his interests, whether the Booth offer should fall through or not, and to endeavor to dispose of his holdings on the "best terms possible." He further advised the bank:

"I will only sell my land in one block and for cash down. I have offered to continue leasing the farm to Mr. Moody if he cares to continue; if not, I must ask you, in the event of Mr. Booth not purchasing, to find another tenant on the best possible terms. In fact, I should like to leave in your hands the entire management of my interests."

On the same day plaintiff wrote Moody, withdrawing any document or letter written by him by virtue of which Moody could claim to act in his behalf in any matter respecting plaintiff's property at Lyle. Moody was also requested to hand over to the bank a certain decree by virtue of which the railroad company (the S., P. & S.) might claim a deed for certain land and any receipt that Moody might have signed in plaintiff's behalf for money received.

This shows the conditions that existed when the correspondence opened respecting the sale which was finally consummated by a delivery of the deed to Whealdon by the bank and the acceptance of an assignment of a mortgage, given by Park, on a portion of the property conveyed to Whealdon, to cover the balance due on the sale. I will now recite in essential detail the correspondence that took place between the parties.

Plaintiff testifies that about August 1st Moody, purporting to act as his agent, gave Nathan Whealdon an option to purchase all plaintiff's lands at Lyle for the price of $35,000, final payment to be made in November, 1910. On August 18, 1910, Moody cabled plaintiff at Cheswardine, England, as follows:

"Booth misrepresents not choked off wanted only portion defeating negotiations made for whole at price above option scheme to avoid probable result pending litigation all your interests safeguarded if settlements through bank preferred satisfactory."

On August 25th plaintiff cabled Moody:

"Cannot withdraw Booth unless you gave option some one previous."

Moody replied on August 26th:

"Gave previous option buyer has satisfied your bank will complete payments November."

On the same day plaintiff cabled:

"Cabled Booth to-day withdrawing option."

On August 31st the bank cabled plaintiff:

"Moody's sale first and best  his buyer responsible  payment through our bank  final settlement November first."

On December 30, 1910, plaintiff wrote the bank as follows:

"I inclose you two deeds as from myself to Mr. N. Whealdon, duly executed before the United States consul, Burslem, England.  I understand the arrangement made by you and Mr. Moody with reference to my property to be that on receipt of the purchase money, viz. $35,000, by your bank, you are to hand over the deed to Mr. Whealdon, which arrangement I take to be confirmed by your cable received November 2d reading as follows: 'Moody's buyer secures amount transfer complete when deeds mailing returned signed.'  When the transaction is completed, and I trust there will be no delay, I shall be much obliged if you will send me the money in the form of a draft, as I do not see the necessity of going to the expense of cabling me the money."

Moody previously had a deed prepared, along with an agreement between Whealdon and plaintiff whereby plaintiff assigned to Whealdon any claim which he might have to compensation for railroad right of way across the land.  The two deeds referred to in the letter must refer to the deed so prepared and the assignment, because it does not otherwise appear that two deeds were executed by plaintiff to Whealdon.

Matters stood in this way until April 9, 1911, when Moody cabled plaintiff:

"Twenty thousand being paid  can I grant buyer ninety days on balance amply secured at six per cent.  I favor because price higher than later sales and buyer inherits our strife with Lyleites."

Plaintiff replied:

"Yes provided draft twenty thousand mailed at once and presuming contract balance signed by you and deed remains bank till final payment  cable if agreed to."

Moody again cabled April 11th:

"Will mail draft and sign contract but surrender deed depositing with bank note doubly secured by mortgage for balance  answer."

Plaintiff replied:

"Agreed  writing."

On the same day plaintiff wrote Moody as follows:

"Confirming my cable of this morning 'Agreed' and with regard to the former cables received, I cannot refrain from saying that it has come somewhat in the nature of a surprise that the whole amount should not be paid over— the more so as the basis of all the negotiations have so far been 'cash on delivery.'  Also I think little of the plea that he inherits our strife with Lyleites, for that he knew about and deliberately took over—it is even mentioned in the deed, if I remember rightly—presuming that you mean the Lyle representatives of the railway.  However, it seemed to me at this distance that it would be unwise of me to insist on a cash basis, without knowing the full and, I've no doubt, adequate reasons that prompted you to recommend $15,000 should be left for 90 days.  As 90 days is specified in your cable, I presume that it is only a temporary mortgage, so to speak, and that you have reason to believe

he will pay up by then—say 10 July—and that if he does not we can sue him, and obtain the balance without difficulty. I must congratulate you on having brought this matter so nearly to an end. I am rather busy to-day, so will say no more than that, but will write again shortly."

Subsequently, namely, on April 14th, the bank delivered the plaintiff's deed to Whealdon, who deeded to Le Roy Park, and accepted from Park $25,000 in cash, Park's note for $10,000 payable in 90 days, and a mortgage from Park and wife on 677 acres of the land upon which Whealdon had the option, and thus closed the transaction. This is the final transaction of which plaintiff complains.

On April 18th Moody further cabled plaintiff:

"Bank remitting twenty five and holding note and mortgage for ten congratulations."

And the bank, on the following day, wrote as follows:

"Inclosed find London draft for £5126.12.6. in payment of your deed to Whealdon, $25,000.00 less mortgage and note for $10,000.00, which I have had placed on record and hold here for you. Mortgage is dated April 14th and runs for ninety days."

Later, through cable from Moody, an extension of 90 days for payment was granted by plaintiff. Plaintiff further testifies that he first learned that Park was interested in the transaction through a letter from the bank of date January 11, 1912, and first learned that Park was the real purchaser when, on November 13, 1913, he received the note and mortgage, which the bank had forwarded to plaintiff at his request, and did not until some time later discover that all the land included in his option to Whealdon was not covered by the Park mortgage. Then followed the foreclosure.

Plaintiff predicates his case upon the proposition that the bank was the holder of an escrow agreement, the terms of which it was bound to observe to the letter, and that it laid itself liable to the plaintiff for not observing the terms of such escrow, to his disadvantage and detriment.

It is no doubt a sound legal principle that one holding an escrow agreement acts at his peril in dealing with either party without the consent of the other. Such an agreement constitutes the holder of the escrow a stakeholder for both parties, and he is "bound above all things not to take sides between the parties, and answerable ultimately to the one or the other, according to their respective rights as between themselves." Citizens' Bank v. Davisson, 229 U. S. 212, 223, 33 Sup. Ct. 625, 629 (57 L. Ed. 1153, Ann. Cas. 1915A, 272).

I am impressed, from a reading of the cablegrams and correspondence between plaintiff and the bank, and the transactions had through Moody, that the bank was something more than a mere escrow holder. It was in a sense the general agent of plaintiff. Plaintiff's letter to the bank of July 25, 1910, constitutes the bank such agent, wherein he says, "I should like to leave in your hands the entire management of my interests." Previously in the same letter, in advising with reference to the Booth option, it being problematical whether the option would result in a completed sale, he said:

"It is impossible for me to negotiate all details at this distance, and I should like you to undertake the management of my interests in any event, * * * and to endeavor to dispose of my holdings on the best terms possible."

So that there is here a delegation of authority to the bank to take the management of his entire interests, and to endeavor to dispose of his holdings. It is hardly possible otherwise to create an agency so completely. Being such an agent, it was therefore not a wholly voluntary act on the part of the bank to cable plaintiff that Moody's sale was first and best, and that the buyer was responsible, etc. The bank was subserving the interest of the plaintiff by so doing.

At this time let us inquire whether Moody was also the agent of plaintiff with respect to the sale of the real property, as negotiated and finally consummated through the delivery of the deed by the bank and the acceptance of the Park mortgage. By his letter of July 25, 1910, plaintiff withdrew from Moody all authority he may previously have had in relation to plaintiff's property at Lyle. Later than this, but evidently before Moody received plaintiff's letter withdrawing authority, Moody, purporting, as plaintiff says, to act as his agent, gave Whealdon an option to purchase the land. When plaintiff was advised of this option by cable of August 18, 1910, he consented to a continuation of negotiations through Moody for a sale to Whealdon. This resulted in plaintiff's withdrawing his option to Booth, and his instructions to the bank to carry into effect Moody's arrangement. In his letter of instructions to the bank he says:

"I understand the arrangement made by you and Mr. Moody with reference to my property to be," etc., stating the arrangement.

This was a recognition that both the bank and Moody had been acting in his behalf with reference to this property, and thus far, at least, he was willing to ratify their acts by his instructions to the bank to close the transaction in pursuance of the terms agreed upon. It was necessary that the deed be transmitted to the bank to enable this to be done. But later Moody found that the transaction could not be closed without a modification of the terms of payment. He advised plaintiff of this, and plaintiff assented by cable, addressed to Moody, not to the bank. So far as the correspondence discloses, the bank was not otherwise advised of the modification except through Moody. Plaintiff at no time, by letter or cable addressed to the bank, modified the explicit instructions first given to the bank by his letter of December 30, 1910. Whatever further specific instructions the bank received respecting the matter were through Moody. Whatever may have been Moody's authority in acting for plaintiff, plaintiff has concededly ratified his acts, at least inclusive of the modification of the primary agreement authorizing the cash payment of $20,000 and acceptance of a mortgage for the balance, to be ample and double security for the payment of such balance. In other words, these later transactions were had directly between Moody and the plaintiff, and what the bank did in the premises must have been through instructions from Moody, or on its own account, having been advised through Moody what had taken place.

It can scarcely be questioned that thus far at least Moody, in doing what he did, acted as the agent of plaintiff, and plaintiff ought not to be heard to controvert his authority. The crucial question is whether either Moody or the bank was authorized to accept the payment of the $25,000 and a mortgage from Park on a portion of the land sold as security for payment of the balance due of $10,000.

As we have seen, Moody was the agent of plaintiff, acting under special instructions, and the bank was the general agent of plaintiff for the "entire management" of his interests, with directions to endeavor to dispose of plaintiff's holdings on the best terms possible. The determination of plaintiff, as voiced by his letter of July 25th, to sell "in one block and for cash down," had been modified by the instructions to sell for $20,000 cash and balance in deferred payment, with ample and double security.

The notion that the note and mortgage were to be given by Whealdon, and not Park, grows out of the fact that the original option to purchase was given to Whealdon. This was an option, it will be noted, that was given by Moody, acting as the agent of plaintiff. Park was, however, an interested party to the negotiations from the beginning. In reality, Whealdon, who was a real estate agent by occupation, was buying the property for Park, and this was completely understood by Moody, and no doubt by the bank also. The exact conditions were not fully disclosed to plaintiff, as they should have been; but the negotiations proceeded on that basis from the first, and were carried into effect in all substantial respects as it was purposed from the beginning, and as Whealdon and Park understood it, as well as Moody and the bank. It is a case of carrying out the substantial understanding of an agreement through agents, without a disclosure to the principal of all the conditions attending the transaction. It is hardly to be questioned that, if the principal had been advised of the true and exact conditions, he would have given his assent, just as he gave it with the limited knowledge he possessed. Moody and the bank were eventually co-operating respecting the transaction as agents of plaintiff, but it might be that the bank was not advised fully as to what information Moody had imparted to plaintiff as to the details of the transaction.

However this may be, it was evidently supposed that the exact details were not a vital factor, so long as the end was to be accomplished in substantial accord with the real understanding of the parties to the option. I say of the "parties," because it must now be conceded that Moody was the agent of plaintiff in negotiating the option, along with the modification that ensued, and I am impressed, considering all the circumstances and conditions attending the transaction and the relationship of the parties, namely, the plaintiff and his agents, Moody and the bank, in furthering the sale, that the bank, with its general authority for managing plaintiff's entire interests, along with his request to dispose of his property on the best terms possible, did not exceed its authority by accepting the note and mortgage of Park in the place of the note and mortgage of Whealdon. It is conceded by the pleadings that Whealdon was financially without personal re-

sponsibility. The mortgage was the real factor to which the parties were looking as security for the deferred payment, and it made no substantial difference to the plaintiff that he got Park's note and mortgage, instead of Whealdon's.

The next contention of counsel is that the mortgage was to have covered the entire property conveyed. This contention is not borne out by the correspondence. Moody's cable of April 9, 1911, says, "Balance amply secured," and in his cable of the 11th he advises, "Will mail draft and sign contract but surrender deed depositing with bank note doubly secured by mortgage for balance." This proposition was agreed to by plaintiff. The language used was of a character, considering the circumstances, to indicate that it was not designed that the mortgage should cover the entire premises. If the whole were to be covered, why indicate that the note would be amply or doubly secured by mortgage? It would have sufficed to say, "Note secured by mortgage on premises." But the saying so or its equivalent was carefully avoided, and plaintiff could not have been misled by these cables.

Another contention is that Moody agreed to sign a contract for the payment of the balance due, and this was not done. Assuming that it was the duty of the bank to have Moody perform his obligations in connection with the matter, the correspondence between plaintiff and Moody on the subject is so ambiguous that it is not susceptible of satisfactory interpretation. One thing is very clear, and that will suffice to answer the contention; that is, that it was not intended that Moody was to become surety for the payment of the note to be given for the balance due. The security for the payment of that note was to be otherwise provided for, namely, by mortgage. Moody agreed to sign the contract—what that was is not clear—but not the note. Nor did he agree to sign any obligation looking to the payment of the note. Moody was acting as agent of plaintiff without compensation, but not under a del credere commission to insure both the solvency of Park and punctual discharge of his debt.

Referring to the criticism that the note was not "amply and doubly secured," it is only necessary to add that this was a matter left to the judgment of Moody and the bank. They exercised their judgment in the premises. While the testimony tends to show that the land covered by the mortgage was worth at the time from $10,000 to $15,000, there is no indication that they acted corruptly, or otherwise than in the utmost good faith, in accepting the security. It should be stated in this connection that Moody gave testimony as to the value of the land covered by the mortgage, and he was of the opinion that the land was worth far more than double the amount of the note, and he exercised his judgment accordingly. I do not think the bank can be charged with any dereliction of duty in this relation.

One other feature should be noticed. It is urged that the bank should have protested nonpayment of the note, so as to fix Whealdon's liability as indorser. I am of the view, considering that the bank was the general agent of plaintiff for managing his interests, that the bank owed a duty to plaintiff to see that nonpayment was duly protested. But, as the protest could not have resulted in any value to

plaintiff, on account of Whealdon's pecuniary irresponsibility, he should not be permitted to recover anything on that account.

The plaintiff is not entitled to recover in the action, and the finding of the court will be for defendant.